# In the
# United States Court of Appeals
## for the Seventh Circuit

JONATHAN PEOPLES,

*Plaintiff-Appellant,*

v.

COOK COUNTY and THOMAS J. DART,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:19-cv-07712.
The Honorable **Charles P. Kocoras**, Judge Presiding.

## BRIEF OF PLAINTIFF-APPELLANT
## JONATHAN PEOPLES

JOHN S. MARRESE
HART McLAUGHLIN & ELDRIDGE
One South Dearborn Street
Suite 1400
Chicago, Illinois 60603
(312) 955-0545

*Counsel for Appellant
Jonathan Peoples, individually, and on behalf of
all others similarly situated*

 

**Save As**    **Clear Form**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-1454</u>

Short Caption: <u>Jonathan Peoples v Cook County, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    <u>Jonathan Peoples, individually and on behalf of a class of all other similarly situated</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    <u>Hart McLaughlin & Eldridge, LLC;    Tomasik Kotin Kasserman, LLC;    J. Moskowitz Law, LLC;</u>

    <u>Reiter Burns LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: <u>/s/ John Marrese</u>    Date: <u>October 11, 2023</u>

Attorney's Printed Name: <u>John Marrese</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑  No ☐

Address: <u>1 S. Dearborn, Suite 1400</u>

    <u>Chicago, Illinois  60603</u>

Phone Number: <u>312.955.0545</u>    Fax Number: <u>312.971.9243</u>

E-Mail Address: <u>jmarrese@hmelegal.com</u>

rev. 12/19 AK

# TABLE OF CONTENTS

**Page(s)**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ................................................ i

TABLE OF AUTHORITIES ................................................................................ iv

JURISDICTIONAL STATEMENT ..................................................................... 1

STATEMENT OF THE ISSUES .......................................................................... 1

STATEMENT OF THE CASE ............................................................................. 2

    I.     Procedural Background ........................................................................ 2

    II.    Factual Background ............................................................................. 3

    III.   Summary Judgment Opinion ............................................................... 8

SUMMARY OF ARGUMENT ............................................................................ 9

ARGUMENT ..................................................................................................... 12

    I.     Standard of Review ............................................................................ 12

    II.    The district court erred in ruling for the Sheriff on Mr. Peoples' Fourth Amendment claim ....................................................................................... 12

        A.    The lower court erred in ruling that the Fourth Amendment is inapplicable to Mr. Peoples' overdetention claim ............................ 12

        B.    Plaintiff's imprisonment for over four days in general population after he had completed his jail sentence violated the Fourth Amendment ......................................................................................... 17

    III.   In the alternative, Appellant presented a triable Fourteenth Amendment claim ....................................................................................................... 19

        A.    Plaintiff had a Fourteenth Amendment right to be free from extended imprisonment after he had completed his jail sentence.. 20

        B.    The Sheriff violated Plaintiff's substantive due process rights by knowingly imprisoning him in the general population for over four days after his jail sentence had ended ........................................ 22

IV.     If the Court finds that the Eighth Amendment applies to Mr. Peoples'
        claim, Appellant nonetheless presented a triable Eighth Amendment
        claim ..................................................................................................................25

V.      The district court erred in ruling that Mr. Peoples failed to show the
        Sheriff's policy of detaining persons until transfer to IDOC was
        deliberately indifferent to their constitutional rights ...................................28

CONCLUSION ......................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**         **Page(s)**

*Aguilar v. Gaston-Camara*,
861 F.3d 626 (7th Cir. 2017) ...............................................25

*Allen v. City of Los Angeles*,
92 F.3d 842 (9th Cir. 1996) ...............................................30

*Armato v. Grounds*,
766 F.3d 713 (7th Cir. 2014) ...............................................25, 27

*Armstrong v. Squadrito*,
152 F.3d 564 (7th Cir. 1998) ...............................................22, 23, 27

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972) ...............................................20

*Bell v. Wolfish*,
441 U.S. 520 (1979) ...............................................17

*Burke v. Johnston*,
452 F.3d 665 (7th Cir. 2006) ...............................................26

*Campbell v. Peters*,
256 F.3d 695 (7th Cir. 2001) ...............................................26

*County of Sacramento v. Lewis*,
523 U.S. 833 (1998) ...............................................22

*Crittindon v. Leblanc*,
37 F.4th 177 (5th Cir. 2022) ...............................................30

*Driver v. Marion Co. Sheriff*,
859 F.3d 489 (7th Cir. 2017) ............................................... *passim*

*Graham v. Connor*,
490 U.S. 386 (1989) ...............................................10, 17, 22

*Harper v. Sheriff of Cook County*,
581 F.3d 511 (7th Cir. 2009) ...............................................23

*Hicks v. LeBlanc*,
832 Fed. Appx. 836 (5th Cir. 2020) ...............................................21

*Hoa v. Riley,*
  78 F.Supp.3d 1138 (E.D. Cal. 2015)................................................................30

*Holloway v. Delaware Cty. Sheriff,*
  700 F.3d 1063 (7th Cir. 2012) .......................................................................23

*Hurd v. Fredenburgh,*
  984 F.3d 1075 (2d Cir. 2021) ....................................................................26, 27

*Jones v. D.C.,*
  No. 16-cv-2405, 2019 WL 5690341 (D.D.C. June 13, 2019) ............12, 14, 15, 16

*King ex rel. King v. E. St. Louis Sch. Dist. 189,*
  496 F.3d 812 (7th Cir. 2007) .........................................................................23

*Lewis v. O'Grady,*
  853 F.2d 1366 (7th Cir. 1988) .......................................................................19

*Manuel v. City of Joliet,*
  137 S. Ct. 911 (2017)...............................................................................12, 17

*Mathews v. Eldridge,*
  424 U.S. 319 (1976)......................................................................................20

*McGee v. Adams,*
  721 F.3d 474 (7th Cir. 2013) .........................................................................26

*Miller v. Chicago Transit Authority,*
  20 F.4th 1148 (7th Cir. 2021) ........................................................................12

*Otero v. Dart,*
  No. 12 C 3148, 2016 WL 74667 (N.D. Ill. Jan. 7, 2016)...................20, 22, 23, 25

*Payne v. Pauley,*
  337 F.3d 767 (7th Cir. 2003) .........................................................................29

*Rockford Bd. of Educ., Sch. Dist. No. 205 v. Illinois State Bd. of Educ.,*
  150 F.3d 686 (7th Cir. 1998) .........................................................................29

*Sample v. Diecks,*
  885 F.2d 1099 (3d Cir. 1989) .........................................................................26

*Shultz v. Dart,*
  No. 13 C 3641, 2013 WL 5873325 (N.D. Ill. Oct. 31, 2013) ..............15, 16, 20, 21

*Scott v. Baldwin,*
720 F.3d 1034 (8th Cir. 2013) ............................................................21

*Stone v. Jeffreys,*
No. 21 C 5616, 2022 WL 1292220 (N.D. Ill. Apr. 29, 2022) ...............27

*Tyson v. Dist. of Columbia,*
No. 20-1450 (RC), 2021 WL 4860685 (D.D.C. Oct. 19, 2021) ............21

*U.S. v. Salerno,*
481 U.S. 739 (1987)............................................................................16

*Villanova v. Abrams,*
972 F.2d 792 (7th Cir. 1992) ..............................................................20

*Wells v. Caudill,*
967 F.3d 598 (7th Cir. 2020) ..............................................................26

*Whitfield v. Spiller,*
76 F.4th 698 (7th Cir. 2023) ...............................................................25

*Williams v. Dart,*
967 F.3d 625 (7th Cir. 2020) .........................................................13, 17

*Williams v. Indiana State Police Dep't,*
797 F.3d 468 (7th Cir. 2015) ..............................................................17

*Wolff v. McDonnell,*
418 U.S. 539 (1974)............................................................................22

**Rules and Statutes**

730 ILCS 5/3-6-3(a)(2.1)...............................................................4, 13

730 ILCS 5/5-1-10 ...............................................................................13

710 ILCS 5/5-7-1 .................................................................................13

730 ILCS 5/5-4.5-15(c) ........................................................................14

42 U.S.C. § 1983 .............................................................................1, 30

# JURISDICTIONAL STATEMENT

Jurisdiction in the District Court was based upon 28 U.S.C. § 1331 because this action—and particularly the claims under 42 U.S.C. § 1983 based on violations of the Fourth, Eighth and/or Fourteenth Amendments of the U.S. Constitution—arise under the laws and Constitution of the United States. The Court had supplemental jurisdiction over the state law claims.

The United States Court of Appeals for the Seventh Circuit has jurisdiction over this appeal from a final judgment of the District Court pursuant to 28 U.S.C. § 1291 and F.R.A.P. 4(a)(1)(A). The date of entry of judgment sought to be reviewed is February 9, 2023. (Doc. 92.) There are no pending claims in the district court litigation. No motion for new trial or alteration of judgment (or any other motion claimed to toll the deadline for appeal) was filed.

Plaintiff-Appellant Jonathan Peoples filed his notice of appeal on March 9, 2023 (Doc. 93), less than 30 days from the District Court's entry of judgment on February 9, 2023 (Doc. 92). This case is not a direct appeal from the decision of a magistrate judge.

# STATEMENT OF THE ISSUES

1.     Did the district court err when it ruled that Mr. Peoples was not entitled to Fourth Amendment protection when the Cook County Sheriff (the "Sheriff") jailed him for four days and four nights after his jail sentence had ended, for the purpose of

delivering him to the Illinois Department of Corrections ("IDOC") to be administratively processed for release?

2. In the alternative, did the district court err on those same facts when it ruled that Mr. Peoples was not entitled to Fourteenth Amendment protection for his overdetention claim?

3. In the event the Court finds that the Eighth Amendment applies to Mr. Peoples' overdetention claim, did the district court err on those same facts when it found that Mr. Peoples had not set forth sufficient evidence to support an Eighth Amendment violation?

4. Did the district court err in finding that Mr. Peoples failed to show that the Sheriff's policy of knowingly jailing him for four days and four nights after the end of his jail sentence, solely to administratively process him for release through IDOC, was deliberately indifferent to his constitutional rights?

## STATEMENT OF CASE

## I. Factual and Procedural Background

### A. Procedural Overview

On September 26, 2019, Plaintiff-Appellant Jonathan Peoples filed a putative class action complaint in the Circuit Court of Cook County, Illinois, alleging claims against Defendants-Appellees Cook County Sheriff Thomas Dart in his official capacity and Cook County, Illinois, for violation of the U.S. Constitution, Illinois Constitution, and Illinois

state law. (Doc. 1-1.) Mr. Peoples' claims all arise from his detention at Cook County Jail beyond the end of his jail sentence, sometimes characterized as an "overdetention" claim. (*Id.*) On November 22, 2019, Defendants-Appellees removed the action to the U.S District Court for the Northern District of Illinois. (Doc. 1.)

After the completion of discovery, Defendants-Appellees moved for summary judgment on all claims on March 4, 2022, and that motion was fully briefed by June 27, 2022. (Doc. 70-87.) On February 9, 2023, the Court granted Defendants' motion for summary judgment on Mr. Peoples' federal claims and, in turn, declined to exercise supplemental jurisdiction over Mr. Peoples' state law claims. (A13-22.[1]) The district court entered judgment for Defendants-Appellees the same day. (A24.)

On March 10, 2023, Mr. Peoples timely filed notice of this appeal. (Doc. 95.) Mr. Peoples challenges the district court's summary judgment ruling here.

### B.    Factual Background

On January 10, 2019, Mr. Peoples was placed on electronic monitoring while his criminal case was pending. (Doc. 82, D-SOF[2] ¶ 58.) He subsequently entered into a plea agreement, to plead guilty to a class 4 felony. (Doc. 82, D-SOF ¶¶ 60, 62.) On Friday, February 15, 2019, Mr. Peoples came from home to the Cook County Circuit Court in

---

[1] Citations to "A__" refer to the Appendix attached to this brief.
[2] "D-SOF" refers to Plaintiff's Response to Defendants' Statement of Material Facts (Doc. 82, ¶¶ 1-79). "P-SOF" refers to Plaintiff's Statement of Additional Material Facts in that same document (Doc. 82, Additional ¶¶ 1-29).

Maywood, Illinois, to enter his plea and receive his sentence. (Doc. 82, D-SOF ¶¶ 9, 59-60.) The judge accepted his plea, ordered that he receive credit for 217 days of time served, and ordered that the Sheriff deliver him to IDOC for IDOC to "confine him in a manner provided by law until the above sentence is fulfilled." (Doc. 82, D-SOF ¶ 64.)

Upon the judge's decision, Plaintiff's jail sentence was complete. (Doc. 82, D-SOF ¶¶ 9-10; *see also* Doc. 71-4, Sentencing Order.) This is because 217 days' credit statutorily entitled him to release from jail for a period of mandatory supervised release ("MSR"). (730 ILCS 5/3-6-3(a)(2.1).) All that remained after the judge's order was for Mr. Peoples to be administratively processed onto MSR. (Doc. 82, D-SOF ¶¶ 9-10; *see also* Doc. 71-4, Sentencing Order.) Mr. Peoples was what is colloquially known as a "turnaround," *i.e.*, someone who is taken back into physical custody solely to be processed out of physical custody.

To effectuate Mr. Peoples' processing post-plea, the Sheriff immediately shackled Mr. Peoples in the courtroom, bussed him from Maywood to Cook County Jail at 26th and California, and imprisoned him in the general population of the jail until the following Tuesday, February 19, 2019, when the Sheriff finally put him on a bus to Stateville's Northern Reception Center in Joliet, Illinois. (Doc. 82, P-SOF ¶¶ 21-27.) Specifically, immediately after entering his plea and being sentenced, Mr. Peoples' possessions were taken, he was handcuffed, and he was placed in a bullpen behind the judge's desk. (Doc. 82, P-SOF ¶ 21.) Several hours later, between 4:00 and 5:00 p.m., Mr. Peoples was moved

to another cell with other individuals. (Doc. 82, P-SOF ¶ 22.) Mr. Peoples was eventually transferred to Cook County Jail with all of those individuals (roughly more than 100 people); they were handcuffed, shackled, lined-up, and put on a bus. (*Id.*) Mr. Peoples arrived at Cook County Jail about 6:00 p.m. (*Id.*)

After Mr. Peoples arrived in Cook County Jail, Mr. Peoples was put into a series of bullpens or holding cells with other persons while he cycled through the intake process, which included a mental health exam, fingerprinting, and photographing. (Doc. 82, P-SOF ¶ 23.) He was not grouped by any security or offense classification during this time. (*Id.*)

During his intake, Mr. Peoples had to sign paperwork to terminate his custody in the electronic monitoring program. (Doc. 82, P-SOF ¶ 24.) After the various stages of processing were completed, Mr. Peoples was put in another bullpen with hundreds of other inmates about 12:00 a.m., where he could make calls and await his housing unit. (Doc. 82, P-SOF ¶ 25.) He was driven with others to his housing unit, Division XI within the Jail, at roughly 1:00 a.m. or 2:00 a.m. in the morning on Saturday, February 16, 2019. (*Id.*) Division XI is an all-male unit for medium/maximum security inmates. (*Id.*)

Mr. Peoples learned on the second day of his imprisonment in Cook County Jail, on Saturday, February 16, from a jail officer and listening to others speak, that he would have to await transfer to IDOC. (Doc. 82, P-SOF ¶ 26.) It was not until Tuesday, February 19, 2019, that Mr. Peoples was told he was ready for transfer to Stateville for further

processing through IDOC. (*Id.*) Mr. Peoples' experience at the Cook County Jail was that one must "defend yourself at all times . . . . It's like survival of the fittest. You can't be soft." (Doc. 82, P-SOF ¶ 27.) The Jail is a violent place and overcrowded. (*Id.*)

The Sheriff's imprisonment of Plaintiff in this fashion, i.e., pending transfer to IDOC's Stateville for processing of release, was routine practice. (Doc. 82, D-SOF ¶¶ 69-70; Doc. 82, P-SOF ¶ 29.) As a matter of course, for years, the Stateville reception center did not accept persons on Wednesdays, Fridays after 1:30 p.m. (or any other day after 1:30 p.m.), Saturdays, Sundays, or holidays. (*Id.*) Given that Mr. Peoples was sentenced on Friday of a holiday weekend, the Sheriff knew he would not be sent to Stateville until the following Tuesday. (*Id.*)

Despite knowledge of Stateville's schedule for years, the Sheriff did nothing to arrange Mr. Peoples' waiting period outside of the jail or even to modify the conditions of his imprisonment such that he would not be treated as if he was a prisoner with jail time still left to serve. (Doc. 82, P-SOF ¶¶ 4, 7, 9-17.)

The Sheriff was capable of doing something. During the Covid pandemic, the Sheriff begun to send turnarounds like Plaintiff home directly from sentencing. (Doc. 82, P-SOF ¶¶ 2, 9.) The Sheriff later picked them up and bussed them to Stateville. (*Id.*)

Specifically, during part of the pandemic, from roughly May 2020 until August 2020, turnarounds were not coming to the Stateville reception center for processing out; they were being released straight from Cook County. (Doc. 82, P-SOF ¶ 8.) All IDOC

processes were handled by IDOC remotely during that time, while the convicted person was in the custody of the Cook County Jail, except for fingerprinting, photographing, DNA-swabbing, and parole paperwork signing, which occurred at the Cook County Jail where IDOC's Bureau of Identification personnel and a parole agent traveled to perform such tasks. (*Id.*)

When IDOC was processing persons on-site at Cook County during the Covid-19 pandemic, it used IDOC's digital Live Scan machine to take fingerprints and photographs of the persons being released onto MSR. (Doc. 82, P-SOF ¶ 10.) A computer was attached to the Live Scan machine that digitally captured the photograph and fingerprint for identification purposes. (*Id.*) In March 2020, for the first time, the CCSO provided IDOC a room at Cook County Jail to handle that processing. (*Id.*)

The Sheriff has also used its own LiveScan machine for "a while" to take photographs and fingerprints for its own purposes. (Doc. 82, P-SOF ¶ 11.) It uses this machine to transmit information to the Illinois State Police (*Id.*)

During the pandemic, after IDOC stopped processing people on site at Cook County Jail during the pandemic and IDOC was not receiving persons at its Stateville reception center, the Sheriff began sending people home to await pick-up on a later day for transmission to IDOC because it "thought it was necessary not to leave people just sitting [in the jail] if they had completed their sentence with whatever jail credit they had been given." (Doc. 82, P-SOF ¶ 9.) There was no court order dictating that the Sheriff send

turnarounds directly home like this during the pandemic. (Doc. 82, P-SOF ¶ 3.) Indeed, the language in the sentencing order received by Mr. Peoples, which stated in pertinent part that "IT IS FURTHER ORDERED that the Clerk provide the Sheriff of Cook County with a copy of this Order and that the Sheriff take the defendant into custody and deliver him/her to the Illinois Department of Corrections and that the Department take him/her into custody and confine him/her in a manner provided by law until the above sentence is fulfilled[,]" was identical post-pandemic. (*Id.*) There was no new judicial order that the Sheriff received since turnarounds have been allowed to return home after sentencing to await pick-up for transfer to IDOC. (*Id.*) There has simply been a general understanding in the Sheriff's Office that turnarounds are being sent home, rather than imprisoned, during the pandemic. (*Id.*)

### C. Summary Judgment Opinion

On February 9, 2023, the district court granted summary judgment in entirety to the Sheriff. (A1-A23.) The court found that neither the Fourth nor Fourteenth Amendment applied to Mr. Peoples' overdetention claims, but rather the Eighth Amendment applied. (A13-A18.) In turn, the court found that Mr. Peoples failed to introduce sufficient evidence of deliberate indifference by the Sheriff sufficient for an Eighth Amendment claim. (A17-A22.) Having dismissed Mr. Peoples' federal claims with prejudice, the court relinquished jurisdiction over his state law claims. (A22.)

# SUMMARY OF ARGUMENT

Jonathan Peoples had been home on electronic monitoring when he returned to a Cook County court to plead guilty to a Class 4 felony. The judge sentenced Mr. Peoples to time served and one year of mandatory supervised release. As such, the jail term of his sentence was complete and all that remained was for Mr. Peoples to be delivered to the Illinois Department of Corrections to be processed out onto MSR. He was what is known colloquially as a "turnaround."

Despite the fact that he was a turnaround, the Sheriff treated Mr. Peoples like any other prisoner. The Sheriff shackled him, took his possessions, and imprisoned Mr. Peoples with the general population of Cook County Jail for over four days and nights before finally bussing him to IDOC's Stateville reception center for processing. IDOC sent him home the same day.

The record below shows that the reason the Sheriff imprisoned Mr. Peoples for over *96 hours* after his jail term had ended was because it was waiting for Stateville to accept him and process his release. But this was not an unexpected snafu in Stateville's receiving schedule. This was Stateville's standard operating procedure, of which the Sheriff had long been aware. Indeed, as a matter of course, Stateville did not accept persons for processing on Wednesdays, Saturdays, Sundays, or holidays—or any day after 1:30 p.m. for that matter. Because Jonathan Peoples was sentenced on a Friday of a

holiday weekend, the Sheriff imprisoned him until they could send him to Stateville the following Tuesday.

Mr. Peoples sued the Sheriff under the Fourth Amendment and, in the alternative the Fourteenth and Eighth Amendments, for this unnecessary, inhumane, and prolonged deprivation of his liberty. On summary judgment, however, the district court dismissed Mr. Peoples' federal constitutional claims with prejudice.

First, the district court found that the Fourth Amendment did not apply to Mr. Peoples' overdetention claim because such amendment "drops out" after a guilty plea. However, such reasoning contravenes the Seventh Circuit's decision in *Driver v. Marion Co. Sheriff*, 859 F.3d 489 (7th Cir. 2017), which applied the Fourth Amendment's reasonableness protections to the overdetention claims of persons just like Mr. Peoples. For that reason, the Court should reverse the lower court's decision and apply the Fourth Amendment to Mr. Peoples' overdetention claim here. When the Fourth Amendment is applied, the record demonstrates that Mr. Peoples' claim must be tried to a jury.

Second, the district court found that the Fourteenth Amendment did not apply to Mr. Peoples' overdetention claim either, relying on *Graham v. Connor*, 490 U.S. 386 (1989) for the notion that the Eighth Amendment applies to all post-conviction claims. However, *Graham* only addresses this issue in a footnote and does not account for persons like Mr. Peoples, whose guilty plea indisputably entitles them to immediate release. In the event the Court finds the Fourth Amendment inapplicable here, the Court should reject the

lower court's rationale for not applying the Fourteenth Amendment, as Mr. Peoples is at least entitled to such protection.

Third, applying the Eighth Amendment's protections to Mr. Peoples, the district court ruled that Mr. Peoples failed to show that the Sheriff was deliberately indifferent to Mr. Peoples' constitutional rights when it jailed him for over four days simply to send him to Stateville for administrative processing for release. Viewing the record in the light most favorable to Mr. Peoples, as the court was required to do, the record belies that conclusion. The Sheriff *knew* that it would be imprisoning Plaintiff — and other turnarounds like him — for prolonged periods awaiting IDOC's reception. Despite this knowledge, the Sheriff did nothing to prevent or remedy Plaintiff's four-day imprisonment. The Sheriff neither attempted to arrange for or expedite his release in any fashion nor did the Sheriff modify the conditions of Plaintiff's confinement in the Cook County Jail. Instead, the Sheriff went about business as usual, incarcerating Plaintiff in the general population of one of the country's most notorious jails.

The Court need not speculate as to whether the Sheriff had an alternative. For some portion of the pandemic, the Sheriff released turnarounds like Mr. Peoples directly home. In other words, had Mr. Peoples been sentenced in 2021, as opposed to 2019, he would not have been imprisoned awaiting transfer to IDOC. For these reasons, as discussed more fully below, the Court should reverse the judgment of the lower court and reinstate Mr. Peoples' federal overdetention claim.

**ARGUMENT**

### I. Standard of Review

The Court's review of the grant or denial of summary judgement is conducted *de novo*, taking facts of record in the light most favorable to the nonmoving party. *E.g.*, *Miller v. Chicago Transit Authority*, 20 F.4th 1148, 1155 (7th Cir. 2021).

### II. The district court erred in dismissing Mr. Peoples' Fourth Amendment claim

#### A. The lower court erred in ruling that the Fourth Amendment is inapplicable to Mr. Peoples' overdetention claim

Upon Mr. Peoples' guilty plea on February 15, 2019, his jail sentence was complete due to 217 days credit of time served. (Doc. 82, D-SOF ¶ 64.)) Mr. Peoples was nonetheless shackled by the Sheriff and imprisoned for four days thereafter, before he was transported to Stateville and released on February 19, 2019. (Doc. 82, P-SOF ¶¶ 21-27.) Based upon the rationale that "[o]nce a trial has occurred, the Fourth Amendment drops out," *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 n.8 (2017), the district court ruled that Mr. Peoples' "guilty plea forecloses any Fourth Amendment challenge to his overdetention." (Dkt. 91, at 13 (citing *Jones v. D.C.*, No. 16-cv-2405, 2019 WL 5690431, at *4 (D.D.C. 2019).)

The district court erred in so ruling. The Seventh Circuit decision of *Driver v. Marion Co. Sheriff*, 859 F.3d 489 (7th Cir. 2017), demonstrates that the application of the Fourth Amendment is not foreclosed post-plea. In *Driver*, as part of reviewing a lower court's class certification decision, the Seventh Circuit applied the Fourth Amendment to

overdetention claims for a broad class of "persons for whom legal authority for detention ha[d] ceased, whether by acquittal after trial, release on recognizance bond, *completion of jail time in the sentence, or otherwise*." *Driver*, 859 F.3d at 491 (emphasis added). The Court noted that, for such persons, "all that is left for the officials is to merely process the release…. [T]he class members already qualify for release, and all that is left are the ministerial actions to accomplish that release which are within the control of the jail officials." *Id.* In *Williams v. Dart*, the Seventh Circuit noted that for the class at issue in *Driver*, "further detention was lawful for only such time as reasonably needed to merely process the release[,]" thereby affirming application of the Fourth Amendment's reasonableness protections to post-plea release processing. *Williams v. Dart*, 967 F.3d 625, 635 (7th Cir. 2020) (internal quotations omitted).

Here, upon Mr. Peoples' sentencing, all that was required was the administrative processing of his release. Mr. Peoples' 217 days credit on his one-year prison sentence indisputably ended any prison term in his sentence, leaving only one year of MSR. (Doc. 82, D-SOF ¶¶ 9-10, 64.) Under 730 ILCS 5/3-6-3(a)(2.1), Mr. Peoples was entitled to "one day of sentence credit for each day of his or her sentence of imprisonment . . . [and] [e]ach day of sentence credit shall reduce by one day the prisoner's period of imprisonment." This resulted in Mr. Peoples' entitlement to release on MSR after serving 50% of his one-year sentence — which 217 days' credit clearly exceeded. 730 ILCS 5/3-6-3(a)(2.1). Since MSR is not imprisonment under Illinois law (*see* 730 ILCS 5/5-1-10; 710 ILCS 5/5-7-1; 730

ILCS 5/5-4.5-15(c)), Mr. Peoples' *jail* sentence had indisputably ended upon entry of the sentencing judge's order.

All that remained, then, was for the Sheriff to deliver Mr. Peoples to IDOC to be processed for release. Such processing involved simple, ministerial actions, including confirming that Mr. Peoples' time-served credit meant that his jail sentence had ended, confirming the absence of outstanding warrants for his arrest, and photographing, fingerprinting, and DNA swabbing him for identification. (Doc. 82, D-SOF ¶ 73; Doc. 82, P-SOF ¶ 12-13, 23-24.) As such, *Driver* dictates that the Fourth Amendment protected Plaintiff from an unlawful seizure or overdetention by the Sheriff, as it would for anyone who had "complet[ed] [his] jail time in the sentence." *Driver*, 859 F.3d at 491. Indeed, the operative complaint in *Driver* included plaintiffs who, similar to Mr. Peoples here, were sentenced to a jail sentence followed by a supervised release (*e.g.*, electronic monitoring). (Doc. 82, P-SOF ¶ 28 & Doc. 82-2, *Driver* Compl. ¶¶ 71-84.) The district court ignored *Driver*.

That the purpose of Mr. Peoples' post-plea detention was purely administrative, and not punitive, further supports Mr. Peoples' entitlement to the protection of the Fourth Amendment. Although non-precedential, the recent district court opinion in *Jones v. D.C.*, is instructive. *Jones v. D.C.*, No. 16-cv-2405, 2019 WL 5690341 (D.D.C. June 13, 2019). There, the court discussed "looking to [the] nature and purpose" of confinement to determine which constitutional standard applies. *Id.* at *3. Specifically, after a judge

sentenced the plaintiff to time served and ordered that he be released, the plaintiff was taken back into custody, strip-searched, and held for "several hours" until he was released while authorities administratively processed him out of custody. *Id.* at *1, *3. The court reiterated the default rule that the plaintiff's "guilty plea … prevents him from challenging his continued post-conviction confinement under the Fourth Amendment." *Id.* at *2. However, it found that given that "[a]ny confinement that Jones experienced as punishment for his underlying conviction ended the moment he was sentenced to time served and ordered released," the Department of Corrections' "decision to take him *back* into custody [for the administrative processing of his release] constituted an actual or constructive re-seizure of his person that required an independent justification." *Id.* at *3 (emphasis in original) (citing *Shultz v. Dart*, No. 13 C 3641, 2013 WL 5873325, at *5 (N.D. Ill. Oct. 31, 2013)).

Central to the court's rationale was the "conceptual distinction between punitive and regulatory confinement." As explained in *Jones*:

> This conceptual distinction between punitive and regulatory confinement sheds light on what happened to [the plaintiff] in this case. A judge sentenced him to "time served" (past tense) and, in doing so, declared an end to any punitive confinement. But, moments later, a new period of regulatory confinement began. The District [of Columbia] does not attempt to characterize this confinement as an extension of Jones's sentence, which had unquestionably run. Nor does it point to any punitive reason—such as retribution, incapacitation, or deterrence—for [the plaintiff]'s continued confinement. Instead, it points to purely 'administrative,' or regulatory, reasons: namely, the need to check for other

detention orders and outstanding warrants. The different character and purpose of this second period of detention demonstrates that it cannot be viewed as a mere extension of the same detention that began months before with [plaintiff]'s initial arrest. Because it took on an entirely different character, it was (or became) a distinct 'seizure' that must be justified on its own terms.

*Id.* (citing *U.S. v. Salerno*, 481 U.S. 739 (1987)); *see also Shultz v. Dart*, No. 13 C 3641, 2013 WL 5873325, at *4 (N.D. Ill. Oct. 31, 2013) (finding Fourth Amendment applied to the plaintiff's overdetention claim even though he had had a probable cause hearing and pled guilty to a misdemeanor offense because "after Shultz was sentenced to time served and told by the judge that he was free to leave, he once again became a free person and thus protected by the Fourth Amendment") (citations omitted).

Mr. Peoples' post-plea jailing had the same administrative, non-punitive purpose here. While the lower court acknowledged the *Jones* and *Shultz* decisions, it distinguished them from Mr. Peoples' case because Mr. Peoples' sentencing judge did not explicitly order him "released." (A15.) That rationale should be rejected for two reasons. First, as discussed above, *Driver* does not limit the post-plea application of the Fourth Amendment solely to persons whom a judge has explicitly ordered released.

Second, the rationale raises a distinction without a substantive difference insofar as the sentencing judge's order ended the jail term of Plaintiff's sentence. Like the plaintiff in *Jones*, individuals who are ordered "released" are regularly taken for administrative processing just as Mr. Peoples was. There is no meaningful difference, then, between Mr.

Peoples' case and *Jones*. For the above reasons, the Court should reverse the decision of the district court and find that, consistent with *Driver* and *Jones*, Mr. Peoples is entitled to the protection of the Fourth Amendment.

### B. Plaintiff's imprisonment for over four days in general population after he had completed his jail sentence violated the Fourth Amendment

Having found that the Fourth Amendment did not apply to Mr. Peoples' claim, the lower court did not address whether Mr. Peoples had proof sufficient to send his Fourth Amendment claim to a jury. Reviewing the record in the light most favorable to Mr. Peoples, the record demonstrates such proof.

"The Fourth Amendment protects the right of the people to be secure in their persons against unreasonable seizures." *Williams v. Dart*, 967 F.3d 625, 632 (7th Cir. 2020) (citing *Manuel*, 137 S. Ct. at 917). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). In assessing reasonableness, the Court must examine "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Such an assessment is inherently fact dependent. *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 472 (7th Cir. 2015).

Here, Plaintiff's detention was unreasonable considering the government's interest in detaining him. Plaintiff was detained for more than four days and nights in the Cook County Jail after his jail sentence had ended. (Doc. 82, D-SOF ¶¶ 77, 79; Doc. 82,

P-SOF ¶ 26.) The Sheriff shackled him, took his possessions, and cycled him through a series of holding cells with hundreds of others before transferring him to a medium/maximum security unit of the Jail for four days. (Doc. 82, P-SOF ¶¶ 21-27.) Despite the fact that Plaintiff's jail sentence was complete and he merely needed to be processed onto MSR, Plaintiff was treated like any other detainee. (*See id.; see also* Doc. 82, P-SOF ¶¶ 4, 29; Doc. 82, D-SOF ¶ 13-15, 77.) This was not a minor ordeal: detention at the Cook County Jail was—and is, as a matter of course—a particularly difficult imprisonment, with Mr. Peoples facing the constant threat of violence in the overcrowded Jail while being kept from family members who expected his return. (Doc. 82, P-SOF ¶ 27.)

At best, the Sheriff's interest in detaining Mr. Peoples could be characterized as an administrative convenience — the Sheriff could keep him close until it was time to take him to Stateville, rather than release him and have to gather him offsite when it was time for delivery. But such an interest pales in comparison to the restriction on Mr. Peoples under the circumstances.

Indeed, the Sheriff's minor interest in keeping Mr. Peoples jailed for four days and nights is illustrated by the fact that, during the Covid pandemic, the Sheriff simply sent persons like Mr. Peoples (turnarounds) directly *home* after guilty pleas and the Sheriff picked them up later when it was time for delivery to IDOC processing. (Doc. 82, P-SOF ¶ 2.) In other words, had Mr. Peoples been sentenced in 2021, he would have been sent

home shortly after his Friday sentencing to await pick-up by the Sheriff the following Tuesday for delivery to IDOC. (*Id.*) That would have made sense. Mr. Peoples' jail sentence was over, and he had already been out of jail for months on electronic monitoring prior to this new, post-sentence detention. (Doc. 82, D-SOF ¶¶ 58-60.) Notably, the decision to send folks home during the pandemic was not ordered by the Court—the Sheriff released turnarounds like Mr. Peoples directly home on authority of the identical form sentencing order with the identical form language received by Mr. Peoples at his sentencing here. (Doc. 82, P-SOF ¶ 2; Doc. 71-4, Sentencing Order.)

Such a record presents a material factual dispute as to whether Plaintiff's prolonged imprisonment was unreasonable under the Fourth Amendment. As the Seventh Circuit explained in *Lewis v. O'Grady*, while "the administrative tasks incident to a release of a prisoner from custody may require some time to accomplish—in [Lewis'] case perhaps a number of hours…. What is a reasonable time for detaining a prisoner in custody is a question best left open for juries to answer based on the facts presented in each case." *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988). A jury should decide Mr. Peoples' claim here as well.

### III. In the alternative, the district court erred in ruling that the Fourteenth Amendment is inapplicable to Mr. Peoples' overdetention claim

If the Court finds that the Fourth Amendment is inapplicable, the Court should find that the district court erred in ruling that Mr. Peoples is not entitled to the Fourteenth Amendment's substantive due process protections.

The Court's analysis here should mirror its analysis under the Fourth Amendment. As the Seventh Circuit has explained, there is likely little "practical difference" in applying the Fourth or Fourteenth Amendment to overdetention cases "since whether the issue of duration is addressed under the Fourth Amendment or under the due process clause, the benefits of confinement to the government must be compared with the costs to the person confined." *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)); *see also Otero v. Dart*, No. 12 C 3148, 2016 WL 74667, at *7 (N.D. Ill. Jan. 7, 2016) (citing *Villanova* for the same proposition); *Shultz*, 2013 WL 5873325, at *5 (same); *Jones*, 2019 WL 5690341, at *4 n.4 (citing *Villanova* and noting "the possibility that [plaintiff]'s two constitutional claims [under the Fourth and Fourteenth Amendments] for over-detention may ultimately merge as a practical matter").

Characterized in substantive due process terms, the record established that: (1) Mr. Peoples had a liberty interest protected under the due process clause; and (2) the Sheriff was deliberately indifferent to that interest when it knowingly imprisoned him for over four days in the general population of Cook County Jail, like any other detainee, despite his jail sentence having ended.

### A. Plaintiff had a Fourteenth Amendment right to be free from extended imprisonment after he had completed his jail sentence

In evaluating whether Plaintiff's substantive due process rights under the Fourteenth Amendment have been violated, the Court "must look to see if [Plaintiff's]

interest is within the Fourteenth Amendment's protections of liberty and property." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570-71 (1972)). "The substantive component of the Fourteenth Amendment's due process guarantee recognizes that the detention of an individual without legal authority may constitute a deprivation of liberty without due process of law." *Shultz*, 2013 WL 5873325, at *5; *see also Driver*, 859 F.3d at 491 ("at some point, the State has no legitimate interest in detaining persons for an extended period of time"); *Scott v. Baldwin*, 720 F.3d 1034, 1036 (8th Cir. 2013) (stating that the plaintiffs "had a clearly established right to be free from wrongful, prolonged incarceration" under the Fourteenth Amendment's due process clause); *Hicks v. LeBlanc*, 832 Fed. Appx. 836, 840 (5th Cir. 2020) ("The Fourteenth Amendment due process clause is violated where a prisoner remains incarcerated after the legal authority to hold him has expired."); *Tyson v. Dist. of Columbia*, No. 20-1450 (RC), 2021 WL 4860685, at *6 (D.D.C. Oct. 19, 2021) (rejecting defendant's argument that plaintiff had no liberty interest because defendant had to deliver him to an inpatient treatment facility, and not to the free world, and explaining that "it cannot be the case that [plaintiff] had no protected interest in avoiding potentially indefinite detention under the custody of DOC merely because he was subject to supervision by a different agency").

Based on the above precedent, Plaintiff had a protectible liberty interest here under the Fourteenth Amendment. While the lower court recognized a split in authority as to whether the Fourteenth or Eighth Amendment governs in these circumstances, it ruled

that the Eighth Amendment applied based on *Graham v. Connor*, 490 U.S.386, 395 n.10 (1989) and *Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998). (A16-17.) However, *Graham* and *Armstrong* do not dictate that outcome. The context within which each of those decisions discuss application of the Eighth Amendment did not account for a person, like Mr. Peoples, whose jail sentence had ended and had been taken back into custody solely to be administratively processed and released — as opposed to a convicted prisoner with jail time left to serve challenging the actions of a correctional official, which is what *Graham* and *Armstrong* had in mind. For that reason, the Court should reject the district court's rationale.

**B.** **The Sheriff violated Plaintiff's substantive due process rights by knowingly imprisoning him in the general population for over four days after his jail sentence had ended**

"The touchstone of due process is protection of the individual against arbitrary action of government . . . [such as] the exercise of power without any reasonable justification in the service of a legitimate government objective." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998).

A substantive due process violation occurs only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Lewis*, 523 U.S. at 847; *Otero*, 2016 WL 74667, at *7. However, the Supreme Court has "endorsed the use of the deliberately indifferent standard for cases in which the defendants have the luxury of forethought" and, indeed, "prison is the quintessential setting for the

22

deliberately indifferent standard because 'in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory.'" *Armstrong*, 152 F.3d at 576 (quoting *Lewis*, 523 U.S. at 851). "When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Armstrong*, 152 F.3d at 577 (quoting *Lewis*, 523 U.S. at 853). "In other words, 'when the circumstances permit public officials the opportunity for reasoned deliberation in their decisions, [courts] shall find the official's conduct conscience shocking when it evinces a deliberate indifference to the rights of the individual.'" *Otero*, 2016 WL 74667, at *8 (quoting *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 819 (7th Cir. 2007)).

As with the Fourth Amendment, the inquiry here evaluates the "totality of the circumstances rather than a formalistic examination of fixed elements.'" *Otero*, 2016 WL 74667, at *7 (quoting *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1069 (7th Cir. 2012)); *see also Harper v. Sheriff of Cook County*, 581 F.3d 511, 515 (7th Cir. 2009) (reasonableness of detention will depend on length of delay and various facts relating to the justification for the detention).

The Sheriff's behavior here is a quintessential example of deliberate indifference. For years, the Sheriff knew that it was imprisoning persons for days after they were entitled to release. (Doc. 82, P-SOF ¶¶ 29.) The Sheriff knew long before Mr. Peoples' arrival that he (and thousands like him) would be shackled and imprisoned in the general population of the Cook County Jail for extended periods of time while they awaited

transfer to Stateville on IDOC's schedule. (Doc. 82, P-SOF ¶¶ 29; Doc. 82, D-SOF ¶¶ 32, 34, 70.) Yet the Sheriff did nothing. The Sheriff did not seek to arrange for release of turnarounds (until the pandemic), did not develop or improve systems of communication with IDOC to enable release remotely or more quickly, did not speak with the courts to develop some alternative procedure—be it release of turnarounds pending transfer to IDOC or a request for sentencing on days that did not subsequently require long periods of incarceration. (Doc. 82, P-SOF ¶¶ 4, 7, 9-17.)

Notably, the Sheriff and IDOC have for years both used digital Live Scan machines to take photographs and fingerprints. (Doc. 82, P-SOF ¶¶ 10-11.) Indeed, the Sheriff even shares information from the Live Scan with the Illinois State Police. (Doc. 82, P-SOF ¶ 11.) Nonetheless, the Sheriff never even *attempted* to arrange a system whereby it could share such information with IDOC to expedite release, i.e., preclude the need to await physical bus transfer from Cook County to Stateville. (Doc. 82, P-SOF ¶ 14.)

Separately, even assuming the Sheriff was required to detain Mr. Peoples for over four days pending transfer to IDOC and even assuming there were no feasible technological fixes to permit remote processing, the Sheriff still did nothing to modify the *nature* of Mr. Peoples' jailing. Plaintiff was jailed in the general population of the Jail, without any recognition of the fact that he had completed his sentence. (Doc. 82, P-SOF ¶ 29.) He was shackled, cycled through holding cells in large groups of people, and jailed in a medium/maximum security unit like any other detainee. (Doc. 82, P-SOF ¶¶ 21-26.)

As such, even though his jail sentence had ended, he was indisputably forced to suffer the same hardship as someone whose sentence was not completed, including living with the fear of violence or threat to his person. (Doc. 82, P-SOF ¶ 27.)

For all of the above reasons, Plaintiff presented sufficient evidence in the lower court to prove a claim of deliberate indifference against the Sheriff under the 14th Amendment. *See Otero*, 2016 WL 74667, at *8 (finding that plaintiff's evidence presented a triable issue against the Sheriff where he introduced evidence showing the Sheriff had a policy of failing to take steps to prevent a substantial risk of harm to Plaintiff of which the Sheriff was aware).

### IV.    In the alternative, the Court should reverse the district court's ruling that Mr. Peoples failed to present a triable Eighth Amendment claim

If the Court finds that neither the Fourth Amendment nor Fourteenth Amendment applies to Mr. Peoples' overdetention claim, then Mr. Peoples nonetheless presented a triable Eighth Amendment claim. To prove an Eighth Amendment violation in this context, Plaintiff "must provide evidence that he was subjected to punishment ([e.g.], additional incarceration) without penological justification and that the defendants acted with deliberate indifference." *Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017); *Armato v. Grounds*, 766 F.3d 713, 721 (7th Cir. 2014); *see also Whitfield v. Spiller*, 76 F.4th 698, 714 (7th Cir. 2023) ("Prison officials may not act with deliberate indifference toward a known risk that a prisoner is being held beyond the term of his incarceration.").

There is no "penological justification" for time served beyond an undisputable release date. *See Wells v. Caudill*, 967 F.3d 598, 602 (7th Cir. 2020) ("Although the Supreme Court has never held that keeping a person in prison beyond the end of his term violates the Eighth Amendment, this circuit has reached that conclusion when the proper length is uncontested."); *Burke v. Johnston*, 452 F.3d 665, 667 (7th Cir. 2006) ("He claims he was detained in jail longer than he should have been due to the 'deliberate indifference and delay' of DOC officials in granting him the jail credit. Such a claim, if proved, would establish a violation of Burke's Eighth Amendment right[.]"); *Campbell v. Peters*, 256 F.3d 695, 700 (7th Cir. 2001) ("If the initial interpretation of the state law that the prison officials had used had been correct, Campbell would not have served too much time in prison and thus would not have been confined without penological justification; if the later interpretation was correct, then he remained behind bars too long [i.e., without penological justification]."); *see also Hurd v. Fredenburgh*, 984 F.3d 1075, 1085 (2d Cir. 2021) ("There is no penological justification for incarceration beyond a mandatory release date because 'any deterrent or retributive purposes served by [the inmate's] time in jail were fulfilled as of that date.'") (quoting *Sample v. Diecks*, 885 F.2d 1099, 1108 (3d Cir. 1989)).

As for "deliberate indifference," this "requires more than negligence, rather the defendant must meet essentially a criminal recklessness standard, that is, ignoring a known risk." *Id.* (citing *McGee v. Adams*, 721 F.3d 474, 480-81 (7th Cir. 2013)) (internal quotations and additional citations omitted). As discussed above, however, "prison is the

quintessential setting for the deliberately indifferent standard because 'in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory.'" *Armstrong*, 152 F.3d at 576 (quoting *Lewis*, 523 U.S. at 851).

It is indisputable that the Sheriff knew it would incarcerate Mr. Peoples in the general population of the prison for four days and four nights after his jail sentence had ended, based on Stateville's receiving schedule. (D-SOF ¶¶ 69-70; P-SOF ¶ 29.) It is indisputable that the Sheriff did nothing to change that fact. Viewing the facts in the light most favorable to Mr. Peoples, then, he has set forth a triable Eighth Amendment overdetention claim. *Stone v. Jeffreys*, No. 21 C 5616, 2022 WL 1292220 (N.D. Ill. Apr. 29, 2022), 2022 WL 1292220, at *5–6; *see also Hurd*, 984 F.3d at 1085-86 & 1086 n.5 (finding that "unauthorized detention of just one day past an inmate's mandatory release date qualifies as a harm" under the Eighth Amendment and the fact that the plaintiff was subject to supervised release thereafter did not mean that his "continued *imprisonment*" was "justified by any penological interest asserted by the State") (emphasis in original).

This case bears none of the hallmarks of officials doing what they believed to be lawful with respect to a jail term, even if ultimately mistaken. *Compare Armato*, 766 F.3d at 721 (finding no deliberate indifference where defendants "were not deliberately ignoring Armato's detainment without penological justification" because defendants "believed releasing Armato, a convicted sex offender, without a term of MSR was contrary to state law" and that "officials were actively pursuing assistance from the AG's

Office from the moment they discovered Armato's release appeared contrary to state law").

For these reasons, the Court should reverse the lower court's dismissal of Mr. Peoples' Eighth Amendment claim.

### V. The district court erred in ruling that Mr. Peoples failed to show that the Sheriff's policy of detaining persons until transfer to IDOC was deliberately indifferent to their constitutional rights

The district court found that even assuming Mr. Peoples had set forth a constitutional violation, he nonetheless failed to adduce evidence that the Sheriff's practice of detaining Mr. Peoples until transfer to IDOC was deliberately indifferent to his constitutional rights. (A20-22.) However, as discussed above, the record demonstrates that the Sheriff knowingly imprisoned Mr. Peoples for four days past the end of his jail sentence.

The lower court's ruling here amounts to a determination that the Sheriff's hands were tied; the Sheriff had no choice due to IDOC's receiving schedule but to jail Mr. Peoples. Specifically, the lower court noted that the Sheriff "introduced evidence showing that [it] had no discretion in determining whether" Mr. Peoples could be released pending transfer to IDOC because "[r]elease on electronic monitoring must be ordered by a judge." (A21.) However, Mr. Peoples demonstrated that the Sheriff did indeed release persons like Mr. Peoples during the Covid pandemic on authority of the very same form sentencing order Mr. Peoples received. (Doc. 82, P-SOF ¶¶ 2-3.) The

Sheriff identified no other order permitting those changed practices. To the contrary, by the Sheriff's own admission, the Sheriff decided to send persons like Mr. Peoples home during the pandemic because the Sheriff "thought it was necessary not to leave people just sitting if they had completed their sentence with whatever jail credit they had been given." (Doc. 82, P-SOF ¶ 9.)

The district court ignored the above evidence, which violates the lower court's obligation to view the evidence in the light most favorable to Mr. Peoples. *See, e.g., Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("We must look therefore at the evidence as a jury might, construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true."). The district court should be reversed on this ground.

While the district court correctly noted that it was Stateville's operating hours that "caused the delay in transporting [Mr. Peoples] to IDOC," this misses the point. The Sheriff knew IDOC's receiving schedule and had known it *for years*. (Doc. 82, P-SOF ¶ 4.) It was the Sheriff that imprisoned Mr. Peoples during that time, not IDOC. The Sheriff cannot avoid liability for its own unconstitutional extended jailing by pointing the finger at a third party (here, IDOC). There is no right to contribution to under Section 1983, let alone the right to a complete defense based on the potential liability of a third party. *See Rockford Bd. of Educ., Sch. Dist. No. 205 v. Illinois State Bd. of Educ.*, 150 F.3d 686, 688–89 (7th Cir. 1998) (casting doubt on the right of contribution among joint government tortfeasors

under 42 U.S.C. § 1983); *see also Allen v. City of Los Angeles*, 92 F.3d 842, 845 n.1 (9th Cir. 1996) ("There is no federal right to indemnification provided in 42 U.S.C. § 1983."); *Hoa v. Riley*, 78 F.Supp.3d 1138, 1446-47 (E.D. Cal. 2015) (holding, based on *Allen*, that Section 1983 does not provide the right of contribution among joint tortfeasors).

Finally, the district court noted that "'timely release' is not the same as instantaneous release" to conclude that Mr. Peoples' four-day imprisonment was constitutional on this record. (A22 (citing *Crittindon v. Leblanc*, 37 F.4th 177, 188 (5th Cir. 2022)).) Four-day and four-night imprisonment at Cook County Jail is not "instantaneous release." Indeed, there is no precedent supporting the constitutionality of a four-day imprisonment for administrative processing. To the contrary, case law dictates that a more appropriate processing period is a matter of hours. *See, e.g.*, *Driver*, 859 F.3d at 491 (finding that a 48-hour administrative release timeframe was far too long in the context). The court should reject the lower court's diminishment of Mr. Peoples' overdetention at the Cook County Jail for this reason.

## CONCLUSION

For the above reasons, the decision of the District Court should be reversed.

(SIGNATURE BLOCK ON FOLLOWING PAGE)

Date: October 13, 2023

Respectfully submitted,

/s/ John Marrese

John Marrese

John Marrese

HART MCLAUGHLIN & ELDRIDGE, LLC

One South Dearborn, Suite 1400

Chicago, IL 60603

P. (312) 955-0545

jmarrese@hmelegal.com

*Attorney for Appellant*

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32, because this document contains 7,745 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word 2016 in 12-point Palatino Linotype font.

Dated: October 13, 2023

*/s/ John Marrese*
John Marrese
Attorney for Appellant

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by

Circuit Rule 30(a) and 30(d) are included in the Appendix.

_/s/ John Marrese_____

John Marrese

**CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2023, the Brief and Short Appendix of Appellants was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ John Marrese
John Marrese

# APPENDIX

# TABLE OF CONTENTS TO APPENDIX

Memorandum Opinion filed February 9, 2023, Doc. 91 ...................................................... A-1

Judgment entered on February 9, 2023, Doc. 92 ................................................................ A-24

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JONATHAN PEOPLES, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) )   19 C 7712 |
| COOK COUNTY, and THOMAS J. DART, Sheriff of Cook County, | ) ) ) |
| Defendants. | ) ) |

## <u>MEMORANDUM OPINION</u>

**CHARLES P. KOCORAS, District Judge:**

In this lawsuit brought under 42 U.S.C. § 1983 and the Constitution and laws of the State of Illinois, Plaintiff Johnathan Peoples claims his constitutional rights were violated by the Cook County Sheriff's Office's ("CCSO") policy or practice of "detaining and re-incarcerating people after they are sentenced to time served without legal justification to do so." Dkt. # 1-1, ¶ 10. Before the Court is Defendants Cook County and Sheriff Thomas J. Dart's[1] Motion for Summary Judgment under Federal Rule of Civil Procedure 56. The Motion is granted in part.

To summarize the relevant events, Plaintiff voluntarily pleaded guilty to a felony charge on February 15, 2019, the Friday afternoon before a holiday weekend. Plaintiff

---

[1] Dart is sued in his official capacity. Official capacity suits are simply "another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). In this case, that entity is the CCSO.

was sentenced to one year in the Illinois Department of Corrections ("IDOC") and one year of mandatory supervised release ("MSR") with 217 days credit towards his jail sentence. Following the imposition of his sentence, Plaintiff was ordered into the custody of the CCSO for the purpose of transporting him to the custody of the IDOC.

The hours for acceptance of new detainees at the Illinois Department of Corrections Northern Reception Classification Center ("IDOC-NRC") ended at 1:30 p.m. that Friday afternoon. As such, Plaintiff remained in the custody of the CCSO until he could be transported to the IDOC, per the court's order, when it opened after the holiday weekend. The transfer to the IDOC-NRC was made on Tuesday, February 19, 2019.

Based on the timing of legal and necessary events, and policies applicable to all persons similarly convicted in Cook County circuit courts, Plaintiff was not subjected to any circumstance that was arbitrary, unreasonable, or motivated by deliberate indifference. That the weekend included a recognized holiday was a consequence of the plea of guilty proffered on the Friday before the holiday.

### **BACKGROUND**

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.

A-2

The CCSO is responsible for running the Cook County Department of Corrections ("CCDOC"). Illinois law requires the CCSO to "receive and confine in such jail, until discharged by due course of law, all persons committed to such jail by any competent authority." 730 ILCS 125/4. Illinois law also requires the CCSO to obey lawful orders of the court. 55 ILCS 5/3-6023 ("Each sheriff shall, in person or by deputy, county corrections officer, or court security officer, attend upon all courts held in his or her county when in session, and obey the lawful orders and directions of the court, and shall maintain the security of the courthouse."). CCSO Court Services deputies are assigned to Cook County courthouse locations where they are responsible for, *inter alia*, obtaining court documents such as sentencing and commitment orders and obeying the lawful orders and directions of the court, including taking individuals into custody following their guilty verdict or plea.

### CCSO 2019 Policies

In 2019, individuals sentenced to the IDOC were transported from the sentencing courthouse to the Cook County Jail ("Jail") on the same day as their guilty plea or verdict. If the individual was sentenced in one of the remote courthouses, they were transported to the Jail by the CCSO on buses that ran between the remote courts and the Jail. Once at the Jail, all individuals with commitment orders were processed through the Receiving Unit at the Jail.

Courtroom deputies from Court Services were responsible for gathering the paperwork from the clerk of the court and bringing it the Receiving Unit. If detainees

3

A-3

were coming from one of the outlying courthouses, the court paperwork was brought to the Receiving Unit at the time of their transport. The Receiving Unit then brought the paperwork to the CCDOC Record Office. A lot of times, it took the clerk of the court "a while" after the end of the court call to put the paperwork together and give it to a Sheriff's deputy to bring back to the Jail. Dkt. # 82, ¶ 19.

Supervisory staff in the Record Office reviewed the paperwork from the court and determined who would remain in CCDOC custody and who would be discharged. They also input information into the jail management system, Cook County Offender Management System. All paperwork related to individuals sentenced to IDOC (regardless of any credit they may have toward their IDOC sentence) was segregated and reviewed by administrative assistants within the Record Office who were assigned to the "IDOC Desk." The release review conducted by the IDOC Desk included setting up transport for the individuals sentenced to IDOC from CCDOC to IDOC.

After receiving an order of commitment to IDOC, the Record Office scheduled transport of detainees to the IDOC-NRC to occur the next business day, unless the judge indicated there was a stay. In advance of the transport of individuals from CCDOC to IDOC-NRC, the CCDOC Record Office emailed commitment orders to IDOC.

CCDOC Policy 717 sets forth the CCDOC's policy related to inmate release. It states that, "it is the policy of the [CCDOC] to provide for the timely, efficient and legal release of inmates." Dkt. # 82, ¶ 29. It was the CCDOC's practice to transport individuals, along with their commitment orders, to IDOC by a Cook County bus or

4

other mode of transportation. The CCDOC's practice was to try to arrive at IDOC with individuals sentenced to IDOC by 8:00 a.m.

CCDOC Policy 702 sets forth the process for intake of anyone that comes into the custody of the CCDOC.  Section 706.6.2 (Inmate Separation) states that "[i]nmates should be kept separate from the general population during the admission process. Newly admitted inmates should be separated according to the facility's classification plan."  Dkt. # 82, ¶ 16.  Individuals already in the Sheriff's custody and housed within the Cook County Jail at the time of their court appearance were sent back to their housing unit by the Receiving Unit.  If an individual was not previously in a housing unit (i.e., they were out on bond or on electronic monitoring), the individuals were classified and given a jumpsuit before they were put into a living unit in the divisions. The Classification Unit is not provided with information related to whether someone is expected to be a turnaround at IDOC and therefore does not take that information into consideration when determining placement.

### IDOC-NRC Hours of Operation

In 2019, IDOC-NRC accepted transfers of male individuals from CCDOC on Mondays, Tuesdays, Thursdays, and Fridays from 8:00 a.m. until 1:30 p.m.  They did not accept transfers on weekends or holidays.  Thus, if an individual was sentenced on a Friday, and Monday was a holiday, the individual would not be transported to IDOC until the following Tuesday.

5

A-5

***IDOC Policies and Procedures***

Pursuant to Illinois law, in 2019, every IDOC sentence included a term of mandatory supervised release ("MSR") in addition to the term of imprisonment, except when a term of natural life was imposed. IDOC has sole legislative authority for managing and processing the release of IDOC inmates onto MSR. 730 ILCS 5/3-3-7(a) ("The conditions of every parole and mandatory supervised release are that the subject: . . . [] be evaluated by the Department of Corrections prior to release using a validated risk assessment and be subject to a corresponding level of supervision."); 5/3-3-7(c) ("The conditions under which the parole or mandatory supervised release is to be served shall be communicated to the person in writing prior to his or her release, and he or she shall sign the same before release.").

IDOC considers a person to be a "turnaround" if they have "been found guilty by plea or trial of a felony in Cook County and sentenced to a term in IDOC that included credit equal or exceeding the amount of time required to be served by them under their sentence and who the CCSO is to deliver to the IDOC for the purposes of processing them out of custody." Dkt. # 82, ¶ 39. If a person has a one-year sentence, is required to serve 50% of the sentence, and is credited with at least 180 days of jail credit, the person has fulfilled their jail sentence. Their jail sentence is considered fulfilled at the time of their release, but their parole/MSR is not.

During February of 2019, when IDOC-NRC clerical staff received copies of sentencing and commitment orders via email from CCDOC, they were able to review

6

A-6

the Orders and identify likely turnarounds in advance of their arrival at IDOC. Based on the information provided by the CCSO in advance of the likely turnarounds' arrival at IDOC-NRC, those individuals were separated from the other detainees so they could be processed and released from IDOC-NRC on the same day they arrived.

IDOC processing of turnarounds includes a check of the sentencing order by clerical staff to ensure it contains the necessary components. IDOC policy requires IDOC to ensure accurate calculation of all sentences and ensure timely release of offenders. This task is performed by the Record Office supervisor. Turnarounds also must fill out parole paperwork.

Individuals identified as turnarounds must be fingerprinted and photographed and undergo DNA swabs when required. The Bureau of Identification takes fingerprints from the individual which are then compared to the fingerprint codes on LEADS. The Bureau of Identification then fills out a form verifying that the person being released is the person who was fingerprinted. The Bureau of Identification also takes photographs and DNA samples from each offender, including turnarounds. All individuals, including turnarounds, are required by IDOC to go through medical at IDOC and see a counselor before they are released.

### *CCSO & IDOC Policies Post-March 2020*

During the COVID-19 pandemic, from May 2020 to approximately August of 2020, the Governor of Illinois ordered that no individuals be transferred to IDOC, including Stateville. During that time, turnarounds were processed by IDOC from the

7

Cook County Jail.  All IDOC processes were handled by IDOC remotely, except for fingerprinting, photographing, DNA-swabbing, and parole paperwork signing, which occurred at the Cook County Jail where IDOC's Bureau of Identification personnel and a parole agent traveled to perform such tasks.

At some point during the COVID-19 pandemic, the court allowed individuals on electronic monitoring who were sentenced to IDOC to return home after sentencing. The Sheriff was then required to pick them up and transport them to IDOC the following business day.  There is no evidence that the CCSO has ever had the discretion to permit a person convicted and sentenced to IDOC to return home before transport to IDOC, for a judge must order that an individual be placed on electronic monitoring.  The language on the form commitment and sentencing order that orders the CCSO to take the defendant into custody and transport him to the custody of IDOC has not changed since the onset of the COVID-19 pandemic.

When IDOC processed persons on-site at the Cook County Jail during the COVID-19 pandemic, it used IDOC's digital LiveScan machine to take fingerprints and photographs of the persons being released onto MSR.  A computer was attached to the LiveScan machine that digitally captured the photograph and fingerprint for identification purposes.  Defendants admit the CCSO has its own LiveScan machine to take photographs and fingerprints which it uses to transmit information to the Illinois State Police, but deny that the CCSO LiveScan machine enables the CCSO to transmit information to IDOC for upload into their tracking system.

8

As of at least November 2021, the CCSO performs its own calculation to identify turnarounds to be brought to IDOC, although the post-pandemic procedures have not altered IDOC's policy of conducting its own calculation.

### *Facts Specific to Plaintiff Peoples*

On December 11, 2018, while on felony probation, Plaintiff was arrested and charged with felony offenses, including unlawful possession of a controlled substance. After approximately 45 days in the Cook County Jail, Plaintiff was released on bond. On January 10, 2019, Plaintiff was placed in the CCSO's electronic monitoring program. Plaintiff was in the custody of the CCSO while he was on electronic monitoring in January and February, including on February 15, 2019.

On Friday, February 15, 2019, Plaintiff appeared in court at the Circuit Court of Cook County's Maywood, Illinois courthouse. His case was called around 1:00 p.m., and he pleaded guilty to possession of a controlled substance. The judge found Plaintiff guilty, sentenced him to one year in the custody of IDOC, and ordered him to serve one year of MSR. The judge also found Plaintiff was entitled to receive credit for time actually served in custody for a total of 217 days. Plaintiff knew when he pleaded guilty that he would not be going home directly and understood he would have to go to the Cook County Jail to be processed. At no time during the plea hearing did the judge tell Plaintiff that he could leave the courthouse and go home after the hearing.

The judge ordered the clerk of the court to "provide the Sheriff of Cook County with a copy of [the commitment and sentence] order." Dkt. # 82, ¶ 66. It was further

9

A-9

ordered that the Sheriff "take the [Plaintiff] into custody and deliver him[] to the Illinois Department of Corrections and that the Department take him[] into custody and confine him[] in a manner provided by law until the above sentence is filled." *Id.* at ¶ 67.

After the sentencing, CCSO courtroom deputies escorted Plaintiff to a temporary holding cell behind the courtroom where he sat by himself for one to two hours. Plaintiff was then transferred downstairs to a larger holding cell where he remained with other detainees for two to three hours.

As noted above, IDOC-NRC's hours of operation did not allow for Plaintiff to be transported to their facility that Friday evening, or at any time on the following Saturday or Sunday. IDOC-NRC's hours of operation also did not allow for Plaintiff to be transported to their facility on Monday, February 18, 2019, because it was a state and federal holiday.

Sometime after 4:45 p.m. on Friday, Plaintiff was taken by bus to the Cook County Jail where he was placed into another large holding cell for several hours until he was processed into the CCDOC. The intake process included a mental health exam, fingerprinting, and photographing. Plaintiff was not grouped by any security or offense classification during this time. After processing, Plaintiff was put into a holding cell for about another two hours before being taken to his housing unit in Division XI, a unit for medium/maximum security inmates.

Plaintiff was transported by the CCSO to the IDOC-NRC facility on Tuesday, February 19, 2019, where his processing included IDOC staff taking fingerprints,

10

A-10

collecting a DNA sample, and providing him with paperwork related to his term of MSR. He was released that same day after processing was complete.

On behalf of himself and others similarly situated, Plaintiff brought claims under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments, the Illinois Constitution, and state law. Defendants move for summary judgment in their favor on all claims as they pertain to Plaintiff Peoples only.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 712 (7th Cir. 2014) (cleaned up).

In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). The nonmovant "must go beyond the pleadings" to demonstrate that there is evidence "upon which a jury could properly proceed to find a verdict in [their] favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013). And "[c]onclusory statements, not

11

grounded in specific facts" cannot defeat a motion for summary judgment. *Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016) (cleaned up).

Not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted). In deciding a motion for summary judgment, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The Court cannot weigh conflicting evidence, assess the credibility of witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704–05 (7th Cir. 2011).

## **DISCUSSION**

Plaintiff brings claims against the CCSO under 42 U.S.C. § 1983, the Illinois Constitution, and Illinois state law. The Court addresses each claim in turn.

### I. **Plaintiff's Federal Claims**

Plaintiffs like Peoples may sue municipalities under 42 U.S.C. § 1983 when their actions violate the Constitution. *See generally Monell*, 436 U.S. 658. To prevail on a *Monell* claim, plaintiffs must identify an action taken by the municipality, the requisite degree of culpability, and a causal link between the municipality's action and the deprivation of federal rights. *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997).

12

A-12

### A.   Violation of a Constitutional Right

Plaintiff must first establish a violation of a constitutional right.  Plaintiff asserts the CCSO's policies violated his rights under the Fourth, Eighth, and Fourteenth Amendments.

### 1.   Fourth Amendment

The Court first examines Defendants' argument that the Fourteenth Amendment applies under the circumstances and not the Fourth Amendment's protections against unreasonable search and seizure.  The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Supreme Court, however, has explained that "[o]nce a trial has occurred, the Fourth Amendment drops out: [a] person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause of the Fourteenth Amendment."  *Manuel v. City of Joliet ("Manuel I")*, 137 S. Ct. 911, 920 n.8 (2017).  Per *Manuel I*, Plaintiff's guilty plea forecloses any Fourth Amendment challenge to his overdetention.  *See Jones v. D.C.*, 2019 WL 5690341, at *4 (D.D.C. 2019).

It is true that other courts have allowed Fourth Amendment claims to proceed in similar circumstances where the plaintiffs sufficiently alleged a "fresh seizure" or "re-incarceration."  For example, in *Shultz v. Dart*, 2013 WL 5873325, at *2 (N.D. Ill. 2013), the plaintiff appeared in court, pleaded guilty to a misdemeanor offense, was sentenced to time served, and was told by the judge that he was free to leave.  Despite

13

being told he was free to leave, the plaintiff remained in the custody of the sheriff's department, was detained in a holding cell at the courthouse, and then transported back to Cook County Jail. *Id.* The defendants moved to dismiss, arguing the plaintiff fell outside of the Fourth Amendment's protections. *Id.* at *4. The court disagreed, stating that "after [the plaintiff] was sentenced to time served and told by the judge that he was free to leave, he once again became a free person and thus protected by the Fourth Amendment." *Id.*

In *Jones*, the plaintiff pleaded guilty and was sentenced to time served and ordered to be released from the department of corrections. 2019 WL 5690341, at *2. He was subsequently transferred to the D.C. Jail where he was held for several hours before being released. *Id.* While the district court found that the plaintiff's guilty plea foreclosed any Fourth Amendment challenge to his continued confinement, it nevertheless declined to dismiss the plaintiff's Fourth Amendment claim because "[a]ny confinement that [the plaintiff] experienced as punishment for his underlying conviction ended the moment he was sentenced to time served and ordered released. *Id.* "And DOC's subsequent decision to take him *back* into custody (either in the courtroom or upon his return to D.C. Jail) constituted an actual or constructive re-seizure of his person that required an independent justification." *Id.* (citing *Shultz*, 2013 WL 5873325, at *5) (emphasis in original).

Importantly, these cases were decided at the motion to dismiss stage, not summary judgment. And, as Defendants point out, a key distinction between Plaintiff's

14

A-14

case and those discussed above is that, in *Schultz* and *Jones*, the plaintiffs were sentenced to time served and were either told by the judge they were free to leave or specifically ordered released. Here, Plaintiff argues that the court's sentencing order, which credited Plaintiff with 217 days of time actually served on his one-year prison sentence, "indisputably ended any prison term of Plaintiff's sentence, leaving only one year of MSR." Dkt. # 83, at 5. The absence of an express direction from the judge—on a pre-typed form order—for Plaintiff's immediate release, Plaintiff says, is merely a matter of semantics. The Court disagrees.

In *Barnes v. District of Columbia ("Barnes I")*, the district court found that the group of plaintiffs stated a valid Fourth Amendment claim where they alleged that "despite being entitled to release, they were taken back into custody and transported to D.C. Jail . . . they allege[d] that they essentially were re-arrested or re-seized." 242 F.R.D. 113, 118 (D.D.C. 2007). At summary judgment, however, the court held that there was no "seizure" triggering the Fourth Amendment protections because the plaintiffs "were already in custody at the time they were ordered released or their sentences expired" and therefore their "freedom of movement had already been terminated." *Barnes v. District of Columbia ("Barnes II")*, 793 F. Supp. 2d 260, 274 (D.D.C. 2011). Additionally, the plaintiffs presented no facts suggesting that their overdetentions involved "fresh seizures" warranting a Fourth Amendment analysis. *Id.*

The Court similarly finds no "fresh seizure" in this case. Plaintiff was in the custody of the CCSO by virtue of his guilty plea. Per the sentencing order, Plaintiff

was to remain in the custody of the CCSO until he was transported to IDOC and processed. Incident to his guilty plea, Plaintiff was necessarily subject to certain administrative tasks before he could be released by IDOC. Plaintiff cannot show a violation of his Fourth Amendment rights.

### 2. Eighth and Fourteenth Amendments

Moving on, Plaintiff argues that even if the Court finds, as it has, that the Fourth Amendment is inapplicable, summary judgment should still be denied because Defendants violated Plaintiff's substantive due process rights under the Fourteenth Amendment. Alternatively, Plaintiff contends he has presented a triable Eighth Amendment claim. In their reply brief, Defendants argue Plaintiff's claims are more appropriately considered under Eighth Amendment, rather than the Fourteenth.

To be sure, authorities differ as to the source of the constitutional right at issue in "overdetention" cases such as this: some find it in the Due Process Clause of the Fourteenth Amendment, while others locate it in the cruel and unusual punishments clause of the Eighth Amendment. *See Shorts v. Bartholomew*, 255 F. App'x 46, 51–52 (6th Cir. 2007) (discussing divergent authority). In this case, Plaintiff's claims should proceed under the Eighth Amendment. *See, e.g., Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) ("After conviction, the Eighth Amendment 'serves as the primary source of substantive protection . . .' Any protection that 'substantive due process' affords convicted prisoners against excessive force is, we have held, at best redundant of that provided by the Eighth Amendment."); *Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th

16

A-16

Cir. 1998) ("Armstrong's Eighth Amendment claim [for overdetention] falls away because that amendment applies only to a convicted prisoner rather than a pretrial detainee whose rights receive the protection of due process."); *Wharton v. Danberg*, 854 F.3d 234, 246–47 (3d Cir. 2017) (recognizing that while some other courts analyze over-detention claims under the Fourteenth Amendment, it has always applied the Eighth Amendment to such claims "because each of our over-detention cases involved convicted and sentenced inmates.").[2]

"Incarceration beyond the date when a person is entitled to be released violates the Eighth Amendment if it is the product of deliberate indifference." *Figgs v. Dawson*, 829 F.3d 895, 902 (7th Cir. 2016); *see also Burke v. Johnston*, 452 F.3d 665, 669 (7th Cir. 2006) ("[W]e agree that incarceration after the time specified in a sentence has expired violates the Eighth Amendment if it is the product of deliberate indifference."). "To defeat summary judgment on his Eighth Amendment claim, [Plaintiff] needs to prove that the defendants held him beyond the term of his incarceration without penological justification, and that the prolonged detention was the result of the defendants' deliberate indifference." *Armato v. Grounds*, 766 F.3d 713, 721 (7th Cir. 2014); *see also Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017) (same).

---

[2] In any event, regardless of whether Plaintiff proceeds under the Eighth or Fourteenth Amendment, the analysis requires a showing of deliberate indifference. *Compare Alcocer v. Mills*, 906 F.3d 944, 953 (11th Cir. 2018) ("When an over-detention occurs and the Fourteenth Amendment governs the analysis, a plaintiff must demonstrate that the defendant acted with deliberate indifference to her due-process rights."), *with Courtney v. Butler*, 756 F. App'x 626, 627 (7th Cir. 2019) ("A plaintiff states an Eighth Amendment claim if he is detained in jail for longer than he should have been due to the deliberate indifference of corrections officials.") (internal quotation marks omitted).

"Deliberate indifference requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk." *Figgs*, 829 F.3d at 903.

It is well-recognized that although an inmate is entitled to timely release from prison, "'timely release' is not the same thing as instantaneous release: it is reasonable for jailers to have some administrative delay in processing an inmate's discharge." *Crittindon v. LeBlanc*, 37 F.4th 177, 188 (5th Cir. 2022); *see also Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988) ("Reasonable time must be allowed for such matters as transportation, identity verification, and processing.").

In the Court's view, that Plaintiff's plea hearing took place on a Friday afternoon before a holiday weekend was unlucky, but it cannot be said that Plaintiff was incarcerated beyond his release date without penological justification. At all times, Plaintiff was in the lawful custody of the CCSO. Pursuant to the circuit court's sentencing order, Plaintiff had not yet completed his sentence. Plaintiff was not entitled to be released until he was transported to IDOC custody, had his sentence calculated, and was processed out on MSR. In other words, Plaintiff has not put forth sufficient evidence that would permit the conclusion that his Eighth Amendment rights were violated by the delay in transfer to IDOC custody or that the violation was due to deliberate indifference.

A-18

### B.    Remaining Elements of Plaintiff's *Monell* Claim

Even assuming that Plaintiff's so-called overdetention violated his constitutional rights, Plaintiff's claim still fails.  Once a Section 1983 plaintiff shows that he was deprived a of a federal right, he must then trace the deprivation to some municipal action (i.e., a "policy or custom"), such that the challenged conduct is "properly attributable to the municipality itself."  *First Midwest Bank ex rel. LaPorta v. City of Chi.*, 988 F.3d 978, 986 (7th Cir. 2021).  There are at least three types of municipal action that may give rise to municipal liability under Section 1983: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority."  *Id.* (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)).

Next, the plaintiff must show that "the policy or custom demonstrates municipal fault," i.e., deliberate indifference.  *LaPorta*, 988 F.3d at 986.  "This is a high bar."  *Id.* at 987.  If a municipality's action is not facially unconstitutional, the plaintiff "must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences."  *Id.* Finally, the plaintiff must show that the municipal action was "the 'moving force' behind the federal-rights violation."  *Id.*  (quoting *Brown*, 520 U.S. at 404).  This "rigorous causation standard" requires "a 'direct causal link' between the challenged municipal action and the violation of [the plaintiff's] constitutional rights."  *Id.* (quoting

A-19

*Brown*, 520 U.S. at 404). "In short, a *Monell* plaintiff must show that some municipal action directly caused him to suffer a deprivation of a federal right, and that the municipality took the action with conscious disregard for the known or obvious risk of the deprivation." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021).

Here, Plaintiff does not challenge an express CCSO policy. Rather, Plaintiff argues for *Monell* liability based on the CCSO's "admitted policy or practice" of "jailing persons while awaiting transfer to IDOC." Dkt. # 83, at 16. In order to succeed on his claim, then, Plaintiff must show that such a practice demonstrates deliberate indifference to his Eighth Amendment rights. This is where Plaintiff fails to meet his burden. Plaintiff has not raised a genuine issue of material fact which might lead to a conclusion that the CCSO maintained a policy or practice which was deliberately indifferent to his constitutional rights.

In arguing that the CCSO practice of detaining convicted felons—specifically, those who qualify as turnarounds—while awaiting transfer to IDOC amounts to deliberate indifference, Plaintiff primarily relies on changes in CCSO and IDOC practices that were implemented in response to the onset of the COVID-19 pandemic. Plaintiff faults the CCSO for not implementing certain technological fixes that would facilitate quicker processing of potential turnarounds. For example, Plaintiff points out that the CCSO has its own LiveScan machine that it uses to transmit certain information to the Illinois State Police. Plaintiff has not shown, however, that it would have been

possible for the CCSO to transmit the necessary information to IDOC, or that IDOC's own policies would permit such a practice.

Plaintiff also criticizes the CCSO because it has never utilized an "electronic or digital process which would permit IDOC to process persons remotely while such persons remain at the Cook County Jail." Dkt. # 88, ¶ 14. While this may be true, Plaintiff offers no evidence that such a process exists or is feasible, or that IDOC would be amenable to that process.

Moreover, and perhaps more importantly, the mere existence or possibility of other, better policies which may have been used is insufficient to prove deliberate indifference. *Frake v. City of Chi.*, 210 F.3d 779, 782 (7th Cir. 2000); *accord Ayoubi v. Dart*, 724 F. App'x 470, 474–75 (7th Cir. 2018). And, in any event, Plaintiff has not put forth evidence tending to show that his alleged overdetention would have been prevented by the various practices implemented in response to the pandemic. On the record before the Court, Plaintiff cannot show that the CCSO's challenged practice was the "moving force" behind the alleged constitutional violation.

Defendants, on the other hand, introduced evidence showing that the CCSO had no discretion in determining whether a convicted felon could be released on electronic monitoring or kept in custody pending transfer to IDOC. Release on electronic monitoring must be ordered by a judge. The CCSO also has no control over when court hearings and sentencings take place. Furthermore, the CCSO's practice was to transport convicted felons to IDOC custody the next business day after their guilty plea. It was

21

A-21

IDOC-NRC's operating hours which caused the delay in transporting Plaintiff to IDOC. It was the practice of the CCSO Records Office to send completed paperwork to IDOC in advance or a transport, allowing IDOC to identify turnarounds prior to their arrival at IDOC-NRC and facilitating a timelier release. Plaintiff was promptly transported to IDOC-NRC as soon as IDOC-NRC's hours allowed.

Ultimately, it is up to IDOC to perform the final calculation of a convicted felon's prison sentence, process them, and release them onto MSR. While there may be flaws in the transfer process, these flaws simply do not rise to the level of deliberate indifference on the part of the CCSO. Again, "'timely release" is not the same as instantaneous release. *Crittindon*, 37 F.4th at 188. The Court therefore grants Defendants' motion for summary judgment on Plaintiff's Section 1983 claims.

## II.    Plaintiff's State Law Claims

Because the Court grants summary judgment on Plaintiff's federal claims, the Court does not have subject matter jurisdiction, and thus declines to exercise its supplemental jurisdiction over Plaintiff's state law claims. 28 U.S.C. § 1367(c)(3). ("The district courts may decline to exercise supplemental jurisdiction [if] the district court has dismissed all claims over which it has original jurisdiction."); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

A-22

## **CONCLUSION**

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment [70] in part as to Plaintiff's Section 1983 claims and declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. Judgment is entered in favor of Defendants on Counts I and II of Plaintiff's Complaint. Civil case terminated.

It is so ordered.

Dated: February 9, 2023

Charles P. Kocoras
United States District Judge

23

A-23

ILND 450 (Rev. 10/13) Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
### NORTHERN DISTRICT OF ILLINOIS

JONATHAN PEOPLES, individually and on
behalf of all others similarly situated,

Plaintiff(s),

v.

COOK COUNTY, and THOMAS J. DART,
Sheriff of Cook County,

Defendant(s).

Case No.  19 C 7712
Judge Charles P. Kocoras

## <u>JUDGMENT IN A CIVIL CASE</u>

Judgment is hereby entered (check appropriate box):

☐  in favor of plaintiff(s)
and against defendant(s)
in the amount of $          ,

which ☐ includes          pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐  in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

---

☒  other: Judgment is entered in favor of Defendants on Counts I and II of Plaintiff's Complaint.

---

This action was *(check one)*:

☐ tried by a jury with Judge       presiding, and the jury has rendered a verdict.
☐ tried by Judge      without a jury and the above decision was reached.
☒ decided by Judge Charles P. Kocoras on a motion for summary judgment.

Date:  2/9/2023

Thomas G. Bruton, Clerk of Court

Vettina Franklin, Deputy Clerk

A-24